UNITED STATES DISTRICT COURT
NORTHERN DISRICT OF MISSISSIPPI
OXFORD DIVISION

| | |
|---|---|
| BOB RAY BRUNSON | Case No. __3:22cv82-MPM-JMV__ |
| Plaintiff, | |
| v. | Jury Trial Demanded |
| SYNGENTA CROP PROTECTION, LLC, SYNGENTA CORPORATION, SYNGENTA AG, CHEVRON U.S.A., INC. & JOHN DOE DEFENDANTS 1-5 | |
| Defendants. | |

## COMPLAINT

COMES NOW Plaintiff, Bob Ray Brunson, through undersigned counsel, and hereby files this Complaint against the Defendants, Syngenta Crop Protection, LLC, Syngenta Corporation, Syngenta AG, Chevron U.S.A., Inc., and John Doe Defendants 1-5, and the Plaintiff states as follows:

## INTRODUCTION

1.     Paraquat dichloride ("Paraquat") is a synthetic chemical compound that has been used as an active ingredient in herbicide products sold in the United States since the mid-1960s. Paraquat is used to kill broadleaf weeds and grasses in fruit and vegetable fields, to control weeds in orchards, and to dry plants before harvest by inhibiting photosynthesis, which results in

destruction of cell membranes. It is typically applied via knapsack sprayers, hand-held sprayers, crop dusters, trucks with pressurized tanks, and tractor-drawn pressurized tanks.

2.     The U.S. Environmental Protection Agency (EPA) has designated Paraquat as a "Restricted Use" product ("RUP"). RUPs have the potential to cause injury to applicators or bystanders without added restrictions. Paraquat is not available for purchase by the public or for residential use and may only be applied by certified applicators. It is one of the most widely used herbicides in the United States.

3.     Paraquat enters the human body through absorption, inhalation, or ingestion. Paraquat then enters the bloodstream and, ultimately, the brain. There, Paraquat molecules cause damage and destruction to dopamine-producing neurons, leading to impaired signaling between neurons and causing the brain to lose control over motor function. Many epidemiological studies have found an association between Paraquat exposure and Parkinson's disease, including studies finding a two- to five-fold or greater increase in the risk of Parkinson's disease in people with occupational exposure to Paraquat compared to people without such exposure. Defendants had knowledge of these studies, as well as the relationship between Paraquat exposure and Parkinson's disease, yet actively concealed this information.

4.     Plaintiff Bob Ray Brunson – like many other victims nationwide – developed Parkinson's disease from exposure to Paraquat manufactured and distributed by Defendants. Parkinson's disease is an incurable, progressive nervous system disorder that affects one's movement. Plaintiff suffered injuries and damages as a direct result of Defendants' defective product and Defendants' wrongdoing, as alleged herein. A claim is hereby made to recover damages for Plaintiff's injuries.

<u>PARTIES</u>

5.      Plaintiff, Bob Ray Brunson, is an adult resident citizen of DeSoto County, Mississippi.

6.      Defendant Syngenta Crop Protection, LLC ("SCP") is a Delaware limited liability company with its principal place of business in at 410 South Swing Road, Greensboro, North Carolina 27409-2012. SCP is a subsidiary of Syngenta Seeds.  SCP advertises, promotes, markets, sells, and distributes Paraquat and other herbicides and pesticides to distributors, dealers, applicators, and farmers, including in the State of Mississippi. SCP may be served with process through its registered agent, C.T. Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

7.      Defendant Syngenta Corporation is a Delaware corporation with its principal place of business located at 3411 Silverside Road, Wilmington, Delaware 19810.  Syngenta Corporation may be served with process through its registered agent, C.T. Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

8.      Defendant Syngenta AG is a corporation organized and existing under the laws of Switzerland with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland. Syngenta AG was formed in 2000 as a result of the merger of Novartis Agribusiness and Zeneca Agrochemicals. Syngenta AG was a publicly traded company on the Swiss stock exchange; American Depositary Receipts for Syngenta AG were traded on the New York Stock Exchange until it was acquired by ChemChina, a Chinese state-owned entity, in 2017.  It has since been de-listed. On information and belief, Syngenta AG continues to operate as a separate unit of ChemChina.  Syngenta AG wholly owns, through its ownership of Syngenta Seeds, SCP.

3

9.      Chevron U.S.A., Inc. ("CUSA") is a Pennsylvania corporation with its principal place of business located at 6001 Bollinger Canyon Road, San Ramon, California 94583.  CUSA may be served with process through its registered agent, CSC of Rankin County, Inc., Mirror Lake Plaza, 2829 Lakeland Drive, Suite 1502, Flowood, Mississippi 39232.

<u>JURISDICTION & VENUE</u>

10.      This Court has personal jurisdiction over Defendants because said Defendants transact business in the Northern District of Mississippi and are corporations doing business within the Northern District of Mississippi.  Paraquat products are and were sold throughout the State of Mississippi.  In addition, Defendants maintain sufficient contacts with the State of Mississippi such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.  Specific to this case, Defendants engaged in the business of developing, manufacturing, testing, packaging, marketing, distributing, and labeling pesticides containing Paraquat in Mississippi, and a lawsuit by a person injured by Paraquat in Mississippi is foreseeable.  Defendants purposefully availed themselves of the privilege of conducting activities within this District, thus invoking the benefits and protections of its laws.

11.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interests and costs, and this case is between citizens of different states.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this

district and/or because Defendants are subject to this Court's jurisdiction with respect to this action.

TOLLING

13.     Plaintiff did not know and had no way of knowing about the risk of serious illness associated with exposure to Paraquat until recently when news was disseminated nationwide.

14.     Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Paraquat is injurious to human health.

15.     Plaintiff did not discover and did not know the facts that would cause a reasonable person to suspect the risks associated with exposure to Paraquat; nor would a reasonable and diligent investigation by Plaintiff have disclosed that Paraquat would cause or had caused Plaintiff's injuries.

16.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

17.     All applicable statutes of limitations have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

18.     Instead of disclosing critical safety information about Paraquat, Defendants consistently and falsely represented the safety of Paraquat and those false representations prevented Plaintiff from discovering this claim.

19.     Defendants were under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiff, accurate safety

information concerning its products and the risks associated with the use of and/or exposure to Paraquat.

20.     Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning Paraquat and the serious risks associated with the use of and/or exposure to its products.

21.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

<u>FACTS</u>

22.     The herbicidal properties of Paraquat were discovered by Imperial Chemical Industries PLC ("ICI") in 1955.

23.     ICI developed, researched, manufactured, and tested Paraquat through its Central Toxicology Laboratory in the early 1960s and produced the first chemical paraquat formulation, which it registered in England and introduced in certain markets under the brand name GRAMOXONE®, in 1962.

24.     ICI was awarded a U.S. patent on herbicide formulations containing paraquat as an active ingredient in 1962.

25.     ICI's Central Toxicology Laboratory performed and submitted the health and safety studies of Paraquat to the United States Department of Agriculture ("USDA") and the United States Environmental Protection Agency ("EPA") to secure and maintain the registration of Paraquat and other pesticides for use in the United States.

26.     In or around 1964, ICI entered into a licensing and distribution agreement with Chevron Chemical Company ("Chevron") to sell Paraquat in the United States. Under this ICI-

6

Chevron Agreement, Chevron obtained an exclusive license to the patents and technical information to permit Chevron to formulate or have formulated, use, and sell Paraquat under the trade name GRAMOXONE® and other names in the United States and to sub-license others to do so. Some form of this agreement remained in effect until September 1986 when ICI paid Chevron for the early termination of its rights under the paraquat licensing and distribution agreement.

27.     Through a long series of mergers, spin-offs, and related corporate transactions, ownership of ICI's Central Toxicology Laboratory was transferred to Syngenta Ltd., a wholly owned British subsidiary of Syngenta AG. Since that time, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and submit health and safety studies to the EPA to secure and maintain the registration of Paraquat and other pesticides in the United States.

28.     Through the same long series of mergers, spin-offs, and related corporate transactions, ICI's agrochemical business was transferred to SCP.

29.     From approximately September 1986 through the present, Syngenta has: manufactured Paraquat for use as an active ingredient in herbicides formulated and distributed for sale and use in the United States, including the State of Mississippi; distributed Paraquat for use as an active ingredient in herbicides formulated and distributed for sale and use in the United States, including the State of Mississippi; formulated Paraquat products distributed for sale and use in the United States, including the State of Mississippi; and distributed Paraquat products for sale and use in the United States, including the State of Mississippi.

30.     Syngenta, through SCP, is now the leading manufacturer of Paraquat, which it sells under the brand name GRAMOXONE®.

31.     Paraquat is designed to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest.

32.     Paraquat products are commonly sprayed multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year, and such use was as intended, directed, or at least foreseeable.

33.     Paraquat is typically sold by Defendants to end-users in the form of a liquid concentrate (and less commonly in the form of granular solids) designed to be diluted with water before or after loading it into the tank of a sprayer, and applied by spraying it onto target weeds.

34.     Paraquat concentrate is formulated with one or more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which typically contains a surfactant) before use.

35.     Paraquat products are typically applied with a knapsack sprayer, hand-held sprayer, aircraft (*i.e.*, crop duster), truck with a pressurized tank, or tractor-drawn pressurized tank, and such use was as intended, directed, or at least foreseeable.

36.     Each year, Paraquat is applied to approximately 15 million acres of agricultural crops, including corn, soybeans, wheat, cotton, fruit and vegetables, rice, orchards and grapes, alfalfa, hay, and other crops.

37.     At all relevant times, it was reasonably foreseeable that applicators of Paraquat and others nearby would be exposed to it when Paraquat was used in its intended, directed, and/or foreseeable manner, including mixing, loading, spraying, or cleaning.

38.     At all relevant times it was reasonably foreseeable that users and others nearby would be exposed to Paraquat through contact with skin, breathing it in, and/or ingesting it.

39.     Parkinson's disease is a terrible disease classified as a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

40.     Parkinson's Disease is now one of the fastest growing neurological condition diagnoses on the planet.

41.     In a 2018 study by the Parkinson's Project, it is estimated that 1.2 million Americans will have been diagnosed with Parkinson's by the year 2030.

42.     The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed); bradykinesia (slowness in voluntary movement and reflexes); rigidity (stiffness and resistance to passive movement); and postural instability (impaired balance).

43.     Parkinson's primary motor symptoms typically result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

44.     Non-motor symptoms are present in most cases, often for years before the primary motor symptoms appear. These non-motor symptoms include, but are not limited to: loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression.

45.     There is currently no cure for Parkinson's disease. Existing treatments do not slow or stop its progression; such treatments are capable only of temporarily and partially

9

relieving the motor symptoms. These treatments also have unwelcome side effects the longer they are used.

46. One of the primary pathophysiological hallmarks of Parkinson's disease is the selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc").

47. Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

48. The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

49. Once dopaminergic neurons die, the body cannot replace them. When enough dopaminergic neurons die, dopamine production falls below the level the brain requires to properly control motor function, thus resulting in the motor symptoms of Parkinson's disease.

50. The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic Neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

51. Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

52. Oxidative stress is a major factor in—if not the precipitating cause of—the degermation and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of Parkinson's disease.

10

53.     Paraquat is highly toxic to plants and animals.

54.     Paraquat is designed to injure and kill plants by creating oxidative stress, which causes or contributes to cause the degeneration and death of plant cells.

55.     Similarly, Paraquat injures and kills animals by creating oxidative stress, which causes or contributes to cause the degeneration and death of animal cells.

56.     Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure—it is a strong oxidant and readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

57.     The redox cycling of Paraquat in living cells interferes with cellular functions that are necessary to sustain life—with photosynthesis in plant cells and with cellular respiration in animal cells.

58.     The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known as a superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids, which are molecules that are essential components of the structures and functions of living cells.

59.     Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical.

60.     Paraquat's redox properties have been known within the science community since at least the 1930s.

61. The same oxidation and redox potentials that make Paraquat highly toxic to plant cells and other types of animal cells make Paraquat highly toxic to nerve cells, including dopaminergic neurons, and create a substantial risk to all persons exposed to Paraquat.

62. The scientific community has known since the 1960s that paraquat is toxic to the cells of plants, animals, and humans because it creates oxidative stress through redox cycling.

63. The surfactants with which the concentrates containing Paraquat manufactured, distributed, and sold by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were likely to increase Paraquat's toxicity to humans by increasing its ability to stay in contact with or penetrate the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, the lungs, and the gastrointestinal tract.

64. Because Paraquat is highly poisonous, the form that is marketed in the United States has a blue dye to keep it from being confused with beverages such as coffee, a sharp odor to serve as a warning, and an added agent to cause vomiting if someone drinks it.

65. Paraquat is a "restricted use pesticide" under federal law, *see* 40 C.F.R. § 152.175, which means it is "limited to use by or under direct supervision of a certified applicator."

66. The same redox properties that make Paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons. That is, Paraquat is a strong oxidant that interferes with the function of dopaminergic neurons, damages those neurons, and ultimately kills them by creating oxidative stress through redox cycling.

67. Although Parkinson's disease is not known to occur naturally in any species other than humans, Parkinson's disease research is often performed using "animal models," in which

12

scientists use Paraquat to artificially produce the symptoms of Parkinson's disease in animal test subjects.

68.     Paraquat is one of only a handful of toxins that scientists use to produce animal models of Parkinson's disease.

69.     In animal models of Parkinson's disease, hundreds of studies involving various routes of exposure have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's disease, and motor deficits and behavioral changes consistent with those commonly seen in human Parkinson's disease.

70.     Hundreds of *in vitro* studies (experiments in test tube, culture dish, or other controlled experimental environment) have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells). Among those, the following are notable.

71.     In 1994, Dr. Afonso Bainy published a study concluding that paraquat in vitro exposure led to an increment in the anti-oxidant capacity of the red blood cell.

72.     In 2002, Dr. Gabriele Schmuck published a study concluding that cortical neurons were found to be more sensitive towards paraquat toxicity than astrocytes as shown by MTT and Neutral Red assay, two different cytotoxicity assays.

73.     In 2019, Dr. Liyan Hou published a study showing that paraquat and maneb exposure induced ferroptosis, a form of regulated cell death, in SHSY5Y dopaminergic cells.

74.     Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between Paraquat exposure and Parkinson's disease, including multiple studies finding a two- to five-fold or greater increase in the risk of

13

Parkinson's disease in populations with occupational exposure to Paraquat compared to populations without such exposure.

75.     In June 2011, Dr. Caroline Tanner published a study examining whether pesticides that cause mitochondrial dysfunction or oxidative stress, including Paraquat, were associated with Parkinson's Disease or clinical features of parkinsonism in humans. The study found that Paraquat use plays a role in human Parkinson's Disease and that "[b]ecause paraquat remains one of the most widely used herbicide worldwide (Frabotta 2009), this finding potentially has great public health significance."

76.     In November 2012, Dr. Samuel Goldman published a study entitled "Genetic Modification of the Association of Paraquat and Parkinson's Disease." The study found that those who applied Paraquat and had the GSTT1*0 genotype were 11.1 times more likely to develop Parkinson's disease. Paraquat damages neurons by generating oxidative stress through redox cycling; the GSTT1 gene encodes an enzyme that prevents redox cycling. Around 20% of Caucasians do not have the GSTT1 gene and thus have the GSTT1*0 genotype. The lack of the GSTT1 gene may cause those with the GSTT1*0 genotype to be more vulnerable to Paraquat's redox cycling mechanism and therefore more likely to develop Parkinson's.

77.     In July 2002, Dr. Alison McCormack published a study examining the effect of Paraquat on mice. The study found that Paraquat injections selectively kill dopaminergic neurons in the SNpc.

78.     Dr. Robert Nisticó published a study in April 2011 that concluded that Paraquat causes the cell death of dopaminergic neurons within the substantia nigra, serotonergic neurons within the raphe nuclei, and noradrenergic neurons within the locus coeruleus. The researchers

noted that Parkinson's pathology begins in the SNpc and "progressively involves noradrenergic and serotonergic neurons within the locus coeruleus and raphe nuclei."

79.     In December 2011, Dr. Phillip Rappold published a study demonstrating how Paraquat entered dopaminergic neurons and killed the neurons through oxidative stress. Paraquat converted to PQ+, which entered dopaminergic neurons through their dopamine transporters. PQ+ then also reacted with dopamine, which enhanced the Paraquat-induced oxidative stress. The researchers argued that dopaminergic neurons are more vulnerable to Paraquat because PQ+ reacts with dopamine to increase oxidative stress.

80.     In November 2012, Dr. Pei-Chen Lee published a study examining the associations between traumatic brain injuries, Paraquat, and Parkinson's disease. The study found an association between Paraquat exposure and Parkinson's.

81.     In May 2013, Dr. Gianni Pezzoli published a meta-analysis examining seven studies on Paraquat exposure. The meta-analysis evaluated the seven studies together and separately evaluated the highest quality studies; in both analyses, those exposed to Paraquat were more likely to develop Parkinson's disease.

82.     In a memorandum from March 2, 2016 recommending mitigation measures for Paraquat, the EPA acknowledged the numerous studies linking Paraquat to Parkinson's disease stating, "[t]here is a large body of epidemiology data on paraquat dichloride use and Parkinson's disease."

83.     The kidney is the main organ responsible for paraquat excretion and Paraquat is known to be highly nephrotoxic. Dermal exposure to Paraquat has revealed inflammatory cell infiltration, tubular necrosis and diffuse interstitial fibrosis. Paraquat causes toxic chemical reactions to occur in the kidneys, and long-term effects, including kidney failure, are possible.

84.     Extensive exposure to Paraquat, like that experienced by Plaintiff, have been shown to more than double the risk of end stage renal disease.

85.     Switzerland, where Syngenta AG maintains its headquarters, has not only prohibited the use of Paraquat since 1989 but recently amended the law on chemical substances to prohibit the export of Paraquat to help protect the health and environment in importing countries, particularly in the developing world.

86.     The Ministry of Agriculture of the People's Republic of China classifies Paraquat as extremely toxic. Paraquat's use or sale in China has been prohibited since September 1, 2020.

87.     Paraquat use has been banned in the European Union since 2007.

88.     The manufacture, formulation, and distribution of herbicides, such as Paraquat, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") before their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

89.     The EPA requires the registrant of a pesticide to conduct a variety of tests as part of the registration process to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

90.     Registration by the EPA is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

91.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and

16

environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

92.     FIFRA generally requires that the registrant conduct health and safety testing of pesticides. The government is not required to, nor does it generally, perform the product tests that are required of the manufacturer.

93.     Syngenta has long misrepresented and denied the harmful side effects of its Paraquat-based products.

94.      In response to growing concern about the safety of Paraquat, Syngenta established a website at www.paraquat.com for the purpose of persuading the public that Paraquat is safe.

95.     Syngenta's statements proclaiming the safety of Paraquat and disregarding its dangers were designed to mislead the agricultural community and the public at large, including Plaintiff.

96.     As of the filing of this Complaint, www.paraquat.com has been taken down by Syngenta.

97.     Defendants knew or should have known that Paraquat was a highly toxic substance that can cause severe neurological injuries and impairment.

98.     Defendants failed to appropriately and adequately test its Paraquat-based products to protect individuals like Plaintiff from the hazards of exposure to Paraquat.

99.     Despite its knowledge that exposure to Paraquat was dangerous, Defendants continued to promote their Paraquat-based products as safe.

17

100.    In fact, in 2003, when Syngenta was dealing with lawsuits regarding another toxic herbicide, atrazine, it was reported that "Sherry Ford, the communications manager, wrote in her notebook that the company 'should not phase out [atrazine] until we know about' the Syngenta herbicide Paraquat, which has also been controversial, because of studies showing that it might be associated with Parkinson's disease. She noted that atrazine 'focuses attention away from other products.'"

101.    Defendants' failure to adequately warn Plaintiff resulted in: (1) Plaintiff being exposed to Paraquat; and (2) scientists and physicians failing to warn and instruct the public, particularly those living in agricultural areas where Paraquat-based pesticides are heavily sprayed, about the risk of Parkinson's disease and renal disease with exposure to Paraquat.

102.    By reason of the foregoing, Plaintiff is severely and permanently injured and has been diagnosed with Parkinson's Disease.

103.    By reason of the foregoing acts and omissions, Plaintiff has endured and continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of Defendants' actions and inactions.

104.    Plaintiff was regularly exposed to Paraquat as a result of direct exposure via handling, mixing, applying, spraying, cleaning up and storing Paraquat.

105.    Plaintiff subsequently began experiencing symptoms of Parkinson's disease in approximately 2019 and was officially diagnosed with Parkinson's disease in approximately 2019.

106.    As a result of Plaintiff's injuries, Plaintiff has incurred significant economic and non-economic damages.

18

107.    Plaintiff was directly exposed to Defendants' Paraquat products from approximately 1962 to 2000.

108.    During the entire time that Plaintiff was exposed to Paraquat, Plaintiff did not know that exposure to Paraquat when handled according to the instructions could be injurious to Plaintiff or others.

109.    Plaintiff only recently first learned that exposure to Paraquat can cause Parkinson's disease, end stage renal disease, and other serious illnesses.


CAUSES OF ACTION

COUNT I
PRODUCT LIABILITY – MPLA

110.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

111.    Plaintiff hereby asserts claims for design defect, failure to warn, breach of warranties and negligence pursuant to the Mississippi Product Liability Statute, MISS. CODE. ANN. § 11-1-63, and other applicable Mississippi law, against all Defendants.

112.    At all times relevant to the Complaint, Defendants were in the business of designing, manufacturing, marketing, testing, labeling, selling and distributing Paraquat. The product at issue was defective and unreasonably dangerous at the time it left the hands of Defendants. Defendants placed their product into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design of the product.

113.     Defendants' product was unreasonably and dangerously defective beyond the extent contemplated by ordinary users with ordinary knowledge regarding the product.  Plaintiff was unaware of the danger as Defendants provided ineffective and inadequate warnings and instructions.

114.     Defendants' product was defective due to inadequate post-marketing warnings and instructions, and/or inadequate testing and studies, and/or inadequate reporting regarding the results.

115.     Defendants' product was defective in light of the dangers posed by its design and the likelihood of those avoidable dangers.  Defendants' product was defective because the inherent risk of harm in Defendants' product design outweighed the utility or benefits of the existing product design.  Defendants' product was defective because reasonably cost-effective and feasible state-of-the-art alternatives existed at the time that would not have undermined the product's usefulness.

116.     Defendants were aware of effective substitutes for the product.  The gravity and likelihood of the dangers posed by the product's design outweighed the feasibility, cost, and adverse consequences to the product's function of a safer alternative design that Defendants reasonably should have adopted.

117.     There was a safer alternative design that would have prevented or significantly reduced the risk of injury.  It was reasonable as well as economically and technologically feasible at the time the product left Defendants' control by the application of existing or reasonably achievable scientific knowledge.

118.    The defective and unreasonably dangerous conditions discussed herein existed when the product left Defendants' control.  Such defects existed when Defendants sold the product.  Such defects existed when Plaintiff received it.

119.    At all relevant times, Defendants knew or reasonably should have known that their product was unreasonably dangerous and defective when used as designed and directed.

120.    Defendants held themselves out as experts and specialists and therefore possessed a higher degree of skill and learning.

121.    Paraquat products were designed, manufactured, formulated, and packaged such that when so used, Paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, while they were being used, or entered fields or orchards where they have been sprayed or areas near where they had been sprayed; and when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, Paraquat was likely to cause or contribute to cause latent, permanent, and cumulative neurological or renal damage, and repeated neurodegenerative disease, including Parkinson's disease to develop over time and manifest long after exposure.

122.    For many years, Plaintiff was exposed to Defendants' Paraquat products regularly and repeatedly for hours at a time resulting in regular, repeated, and prolonged exposure of Plaintiff to Paraquat.

123.    Defendants had a duty to exercise reasonable care, and to comply with the then existing standard of care, in the design, testing, research, development, packaging, distribution, promotion, marketing, advertising, instruction, and sale of their product. Specifically:

21

(a)     Defendants had a continuing duty to ensure that the product they provided was safe and used correctly through proper design, testing, research, adequate instruction, post-market surveillance, and appropriate modifications;

(b)     Defendants had a duty to anticipate the environment in which the product would be used and to design against the reasonably foreseeable risks attending the product's use in that setting, including misuse or alteration;

(c)     Defendants had a continuing duty to give an adequate warning of known or reasonably foreseeable dangers arising from the use of their product;

(d)     Defendants had a duty to provide adequate warnings and instructions, which means they had to be comprehensible to the average user, calculated to convey the material risks to the mind of a reasonably prudent person, and of an intensity commensurate with the danger involved;

(e)     Defendants had a continuing duty to assure the product they provided was properly labeled and true to the representations Defendants made about it;

(f)     Defendants had a continuing duty to make sure their product had complete and accurate information and instructions concerning its proper use;

(g)     Defendants had a continuing duty to modify their products, and their packaging, instructions, promotional and advertising efforts to eliminate confusion and user error, assure compliance and prevent harm; and

(h)     Defendants had a continuing obligation to disseminate appropriate content and employ appropriate methods to convey accurate and complete product information.

124. In violation of the existing standards and duties of care, Defendants, individually and collectively, deviated from reasonable and safe practices in the following ways, by:

(a)  designing a product defective in design and warnings/instructions;

(b)  failing to conduct pre and post market safety tests and studies;

(c)  failing to collect, analyze, and report available data regarding use of Defendants' product;

(d)  failing to conduct adequate post-market monitoring and surveillance;

(e)  failing to include adequate warnings and/or instructions;

(f)  failing to provide adequate warnings and/or proper instructions regarding proper uses of the product;

(g)  failing to inform users that Defendants had not adequately tested or researched the product to determine its safety and risks;

(h)  failing to educate and instruct users about the unique characteristics of their product and the proper way to use it;

(i)  failing to implement and execute corrective and preventive actions to eliminate injuries; and

(j)  continuing to promote and market the product despite the foregoing failures.

125. Defendants also breached express warranties. Defendants represented and warranted to the Plaintiff that its Paraquat products were safe for use in accordance with the Defendants' protocols. Said representations were in the form of marketing materials, product information and product materials provided to the Plaintiff and the public. Plaintiff justifiably relied on said representations and express warranties in electing to use said product.

126. Paraquat did not conform to Defendants' representations and warranties. At all relevant times, said product did not perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner. At all relevant times, said product did not perform in accordance with the Defendants' representations.

127. Defendants' product was not fit for the ordinary purpose for which such goods were used. It was unmerchantable when used as directed and defective in design, and the Defendants' failure to provide adequate warnings and instructions also resulted in said product being unreasonably dangerous. Defendants' product was dangerous to an extent beyond the expectations of ordinary consumers with common knowledge of the product's characteristics, including Plaintiff.

128. Defendants' conduct showed willful, malice, wantonness, oppression, or that entire want of care that raises the presumption of conscious indifference to consequences. Defendants' wrongdoing constitutes gross negligence, and said gross negligence proximately caused the injuries and the damages sustained by Plaintiff.

129. Furthermore, Defendants' breaches of duties to Plaintiff – as provided by the MPLA – include but are not limited to the following:

(a) failed to design, manufacture, formulate, and package Defendants' Paraquat products to make Paraquat unlikely to be inhaled, ingested, and absorbed into the

24

bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

(b) designed and manufactured Paraquat and designed and formulated Defendants' Paraquat products such that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, Paraquat was likely to cause latent, cumulative, and permanent neurological or renal damage, and repeated exposures were likely to cause or contribute to cause clinically significant renal or neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

(c) failed to perform adequate testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption; into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

(d) failed to perform adequate testing to determine the extent to which spray drift from Defendants' Paraquat products was likely to occur, including their propensity to drift, the distance they were likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying Defendants' Paraquat products or nearby during or after spraying;

25

(e)     failed to perform adequate testing to determine the extent to which Paraquat, when inhaled, ingested, or absorbed into bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological or renal damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant renal or neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

(f)     failed to perform adequate testing to determine the extent to which Paraquat, when formulated or mixed with surfactants or other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological or renal damage, and the extent to which repeated exposures were likely to cause or contribute to cause significant renal or neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

(g)     failed to direct that Defendants' Paraquat products be used in a manner that would have made it unlikely for Paraquat to have been inhaled, ingested, or absorbed into the bodies of persons who used Defendants' Paraquat products, were nearby

26

while they were being used, or entered fields or orchards where they had been

sprayed or areas near where they had been sprayed, and;

(h) failed to warn that when inhaled, ingested, or absorbed into the bodies of persons

who used Defendants' Paraquat products, were nearby while they were being

used, or entered fields or orchards where they had been sprayed or areas near

where they had been sprayed, Paraquat was likely to cause or contribute to cause

significant renal or neurodegenerative disease, including Parkinson's disease, to

develop over time and manifest long after exposure.

130.    Defendants knew or should have known that at all relevant times that their

Paraquat products were in a defective condition and were (and are) unreasonably dangerous and

unsafe and would create a substantial risk of harm to persons who used them, were nearby while

Paraquat products were being used, or entered fields or orchards where Paraquat products had

been sprayed or areas near where Paraquat products had been sprayed.

131.    Armed with this knowledge, Defendants voluntarily designed their Paraquat

products with a dangerous condition knowing that in normal, intended use, consumers such as

Plaintiff would be exposed to it.

132.    Plaintiff was exposed to Paraquat without knowledge of Paraquat's dangerous

characteristics.

133.    At the time of Plaintiff's exposure to Paraquat, Paraquat was being used for the

purposes and in a manner normally intended, as a broad-spectrum pesticide.

134.    At the time of each sale of Defendants' Paraquat products that resulted in

Plaintiff's exposure to paraquat, Defendants impliedly warranted that Defendants' Paraquat

27

products were of merchantable quality, including that they were fit for the ordinary purposes for which such goods were used.

135.     Defendants breached this warranty as to each sale of Defendants' Paraquat products that resulted in Plaintiff's exposure to Paraquat, in that Defendants' Paraquat products were not of merchantable quality because they were not fit for the ordinary purpose for which such goods were used by Plaintiff who was either in direct privity with Defendants through purchase of the Paraquat products or was an employee of the purchaser to whom the warranty was directly made and, therefore, an intended third-party beneficiary of such warranties.

136.     Plaintiff could not, by the exercise of reasonable care, have discovered Paraquat's defects herein mentioned or perceived its danger.

137.     At all relevant times, Defendants' Paraquat products were in a defective condition such that they were unreasonably dangerous to those exposed to them and was so at the time they were distributed by Defendants and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Paraquat was due in part to the fact that it was not accompanied by proper warnings regarding its toxic qualities and possible health effects, including, but not limited to, developing Parkinson's disease or renal disease as a result of exposure. That defective condition was not a common propensity of the Paraquat products that would be obvious to a user of those products.

138.     Defendants' Paraquat products did not contain a necessary warning or caution statement that, if complied with, would have been adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

139.     Defendants failed to include a necessary warning or caution statement that, if

complied with, would have been adequate to protect the health of those exposed. Defendants could have revised Paraquat's label to provide additional warnings.

140. Defendants failed to warn of the nature and scope of the health risks associated with Paraquat, namely its toxic properties and its propensity to cause or serve as a substantial contributing factor in the development of Parkinson's disease or renal disease.

141. Defendants knew of the probable consequences of exposure to Paraquat. Despite this fact, Defendants failed to exercise reasonable care to warn of the dangerous toxic properties and risks of developing Parkinson's disease or renal disease from Paraquat exposure, even though these risks were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, acted with conscious disregard for Plaintiff's safety.

142. Defendants, as manufacturers and/or distributors of Paraquat, are held to the level of knowledge of an expert in the field. There was unequal knowledge with respect to the risk of harm, and Defendants, as manufacturers of Paraquat products possessed superior knowledge and knew or should have known that harm would occur in the absence of a necessary warning.

143. Plaintiff reasonably relied on the skill, superior knowledge, and judgment of Defendants.

144. Had Defendants properly disclosed the risks associated with Paraquat, Plaintiff would have taken steps to avoid exposure to Paraquat.

145. The information that Defendants provided failed to contain adequate warnings and precautions that would have enabled users to use the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity,

29

duration, and extent of the risk of injuries associated with use of and/or exposure to Paraquat; continued to promote the efficacy of Paraquat, even after they knew or should have known of the unreasonable risks from exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Paraquat.

146.     To this day, Defendants have failed to adequately warn of the true risks of exposure to Paraquat, including the risks manifested by Plaintiff's injuries associated with exposure to Paraquat.

147.     As a result of its inadequate warnings, Paraquat was defective and unreasonably dangerous when it left Defendants' possession and/or control, was distributed by Defendants, and when Plaintiff was exposed to it.

148.     As a direct and proximate result, Plaintiff developed Parkinson's disease, and suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

## COMPENSATORY DAMAGES

149.     Plaintiff suffered serious injuries and damages as a direct and proximate result of the conduct and breaches of the Defendants, as aforesaid, for which compensation is required. Specifically, Defendants' products caused the Plaintiff to sustain Parkinson's, which was first diagnosed in or around the year 2019.

150.     Plaintiff has sustained many months of extreme pain and suffering, which will continue into the future, as well as extensive medical treatment.  Indeed, Plaintiff will have to

30

live with Parkinson's for the rest of his life. He will be forced to undergo ongoing monitoring and treatment throughout his life. Plaintiff is seeking monetary damages from the Defendants to compensate the Plaintiff for damages arising from the Defendants' product and wrongdoing, including all damages allowed pursuant to Mississippi law

151.   As a result of the aforementioned acts and/or omissions, Defendants are liable for all elements of damages, including but not limited to:

(a)   Damages for past doctor, hospital, drug, and medical bills;

(b)   Damages for future doctor, hospital, drug, medical bills, medical monitoring, life care plan and any other future costs and bills related to medical treatment;

(c)   Damages for disfigurement, impairment and disability;

(d)   Damages for past mental anguish and emotional distress;

(e)   Damages for physical pain and suffering;

(f)   Damages for loss of enjoyment of life;

(g)   Damages for reduced life expectancy;

(h)   Damages for loss of wages and wage-earning capacity;

(i)   Damages for all other losses, both economic and intrinsic, tangible and intangible, sustained by the Plaintiff, all of which were proximately caused by the acts and/or omissions of the Defendants; and

(j)   Any other relief which the Court or jury deems just or appropriate based upon the circumstances.

152.   Plaintiff reserves the right to prove the amount of damages at trial. The amount of compensatory damages will be in an amount to be determined by the jury.

<u>PUNITIVE DAMAGES</u>

153.    As set forth herein above, Defendants' conduct exhibited gross negligence and a willful, wanton and reckless disregard for the safety of the Plaintiff and others, constituting an independent tort.  As a result of said conduct alleged herein, Defendants are liable for punitive damages and attorneys' fees, all litigation expenses and associated costs of litigation, pre-judgment interest and other damages pursuant to the Mississippi Punitive Damages Statute, Miss. Code Ann. § 11-1-65.

154.    The conduct justifying an award of punitive damages includes, but is not limited to, the Defendants' willful, malicious, intentional and gross negligence, the fraudulent and/or negligent acts of misrepresentation and/or concealment, as well as other conduct described herein.  The amount of punitive damages to be awarded is an amount to be determined by the jury.

155.    Plaintiff prays that punitive or exemplary damages be assessed against the Defendants in an amount sufficient to punish the Defendants for their wrongful conduct and to deter like conduct in the future, and to serve as an example and a warning to others, so as to deter others from engaging in a similar course of conduct and to encourage other companies to have due and proper regard for the rights and lives of consumers, and to protect the general public from future wrongdoing.  Plaintiff prays that punitive damages be awarded in the appropriate amount to accomplish these purposes, taking into consideration the appropriate factors as set forth by Section 11-1-65 of the Mississippi Code Annotated and/or other law, including the degree of reprehensibility of the Defendants' conduct, harm likely to result from the Defendants' conduct, the duration of that conduct, the Defendants' awareness of the wrongfulness of such actions, and the Defendants' financial condition.

32

156. WHEREFORE, PREMISES CONSIDERED, Plaintiff sues and demands judgment from Defendants, Syngenta Crop Protection, LLC, Syngenta Corporation, Syngenta AG, Chevron U.S.A., Inc., and John Doe Defendants 1-5, and respectfully requests an order from this Court awarding damages and compensation for the following:

(a) An award of actual, consequential and incidental damages in such amounts as are sufficient to compensate in full Plaintiff for the losses and damages actually incurred as a result of the Defendants' defective product and wrongdoing;

(b) An award of punitive damages in an amount adequate to deter the Defendants and serve as an example to deter similar conduct in the future;

(c) An award of Plaintiff's costs and expenses incurred in connection with this action, including attorneys' fees, expert witness fees and all other costs herein;

(d) An award of pre-judgment and post-judgment interest as the Court deems appropriate; and

(e) Granting such other and further relief as the Court deems just and proper, including restitution, imposition of a constructive trust and/or such extraordinary equitable or injunctive relief as permitted by law, equity or statutory provisions as the Court deems proper to prevent unjust enrichment of the Defendants and to provide the Plaintiff with an effective remedy for the damages caused and injuries suffered as a result of the Defendants' wrongdoing as aforesaid.

JURY TRIAL DEMANDED

Respectfully submitted, this the 13th day of May, 2022.

BOB RAY BRUNSON

/s/ Jason L. Nabors
Jason L. Nabors, MSB #101630

JASON L. NABORS, MS BAR NO. 101630
NABORS LAW FIRM
P.O. Box 1334
Ridgeland, MS 39158
Telephone:  (601) 790-7270
Facsimile:  (601) 300-2975
Email:  jason@naborslawfirm.com

ROBERT A. MALOUF, MS BAR NO. 1844
P.O. Box 1334
Ridgeland, MS 39158
Telephone: 601-856-7392
Facsimile: 601-856-7396
Email: ramalo@aol.com